*Eritrean Orthodox Tweahdo Diocese of USA and Canada v. Abune Sinoda*, No. 49, September Term, 2025. Opinion by Biran, J.

**UNITED STATES CONSTITUTION – FIRST AMENDMENT – ECCLESIASTICAL ABSTENTION DOCTRINE –** The First Amendment to the United States Constitution prohibits governmental bodies from establishing any preferred religion and protects the fundamental right to the free exercise of religion. To ensure that courts do not become entangled in religious disputes, the ecclesiastical abstention doctrine prohibits courts from resolving legal claims that necessarily turn on matters of religious doctrine, faith, or governance. However, if a court need not answer an ecclesiastical question to resolve a dispute, and can instead apply neutral principles of law to decide the merits, then the court must do so. Petitioner, a Maryland religious corporation, filed a wrongful detainer action seeking to reclaim real property from Respondent, who claims to be Petitioner's rightful leader. Respondent was serving as the Bishop of the United States and Canada of the Church with which Petitioner is affiliated and the Chairman of Petitioner's Board when the Church defrocked him and removed him as Bishop. Petitioner subsequently requested that Respondent vacate a residence owned by Petitioner and used as a parsonage for the Church's Bishop of the United States and Canada. Respondent refused to vacate the premises, contending that the Holy Synod of the Church is illegitimate and that his removal as Bishop by the Holy Synod therefore was improper.

The Supreme Court of Maryland held that the ecclesiastical abstention doctrine does not apply to this case. To resolve this dispute, it is not necessary to determine whether the Church's decision to defrock Respondent is proper as a matter of religious doctrine. Rather, the dispute may be decided through application of neutral legal principles. In the absence of any express language concerning property rights within the religious documents of the Church, the resolution of this dispute does not turn on the "rightful" religious decision maker or the propriety of Respondent's removal as Bishop. The determination of those questions would not alter the civil property analysis because there is no evidence that the incumbent Bishop of the United States and Canada has a legal possessory interest in the Property.

**REAL PROPERTY – ACTION FOR WRONGFUL DETAINER – REMOVAL OF LICENSEE –** A wrongful detainer occurs when an individual "hold[s] possession of real property without the right of possession." Md. Code Ann., Real Prop. § 14-132(a) (1999, 2023 Repl. Vol., 2025 Supp.). It is undisputed that there was never a written lease that governed Respondent's occupancy of Petitioner's property. Respondent made no rent payments to Petitioner, and there is no evidence that Petitioner ever recognized Respondent as a tenant with an exclusive right to possess the residence. Therefore, the Supreme Court of Maryland held that Respondent occupied Petitioner's real property as a licensee, not as a tenant. Unlike a tenancy, a license to occupy property may be revoked at the pleasure of the licensor. It was undisputed that Petitioner revoked Respondent's license to occupy the residence. Thus, Petitioner is entitled to judgment on its claim for wrongful detainer.

IN THE SUPREME COURT

OF MARYLAND

No. 49

September Term, 2025

---

ERITREAN ORTHODOX TWEAHDO
DIOCESE OF USA AND CANADA

v.

ABUNE SINODA

---

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

---

Opinion by Biran, J.

---

Filed: July 23, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The First Amendment to the United States Constitution prohibits governmental bodies from establishing any preferred religion and protects the fundamental right to the free exercise of religion. To ensure that courts do not become entangled in religious disputes, the ecclesiastical abstention doctrine prohibits courts from resolving legal claims that necessarily turn on matters of religious doctrine, faith, or governance. Although this abstention doctrine protects religious organizations from judicial interference in spiritual matters, secular laws often may be applied to religious institutions and officials without running afoul of the First Amendment. In this case, we consider whether the ecclesiastical abstention doctrine precludes a Maryland court from deciding a wrongful detainer action brought by a religious corporation to reclaim possession of real property from the person who claims to be the corporation's rightful leader.

The Eritrean Orthodox Tweahdo Church (the "Church") is headquartered in Asmara, Eritrea. In 2005, the Church's Holy Synod (the "Synod") appointed Abune Sinoda Tafla, the Respondent before us, to be the Church's Bishop of the United States and Canada.

The Petitioner in this appeal is a Maryland religious corporation, Eritrean Orthodox Tewahdo Diocese of U.S.A. and Canada, Inc. (the "Corporation").[1] In 2006, Respondent filed Articles of Incorporation to form the Corporation. The Corporation holds title to real property located at 812 Chillum Road in Hyattsville, Maryland (the "Property"). The

---

[1] The Corporation informs us that varying spellings of "Tweahdo" are used in its official documents due to differences in transliteration from Ge'ez. The Corporation's name, as stated in its Articles of Incorporation, differs slightly from the reference to the Corporation in the case caption.

Corporation purchased the Property in 2011. After acquiring the Property, the Corporation used it as a parsonage for the Church's Bishop of the United States and Canada. Respondent has resided at the Property from the time the Corporation purchased it.

In 2016, the Synod defrocked Respondent and removed him as Bishop of the United States and Canada. Although the Corporation subsequently requested on several occasions that Respondent vacate the Property, he declined to do so. The Corporation eventually filed a complaint for wrongful detainer in the District Court of Maryland sitting in Prince George's County, alleging that Respondent occupies the Property without any legal entitlement to do so. The Corporation sought possession of the Property, as well as $20,000 in damages and $10,000 in attorney's fees. At trial, Respondent disputed the legitimacy of the Synod and contended that he remains the Church's rightful Bishop of the United States and Canada. As the rightful Bishop, Respondent argued, he retains a possessory right in the Property.

The District Court reasoned that, in order to determine which party is entitled to possess the Property, it would need to decide whether the Synod's decision to remove Respondent as Bishop was correct as a matter of Church law and policy. For this reason, the District Court determined that, under the ecclesiastical abstention doctrine, it was required to dismiss the Corporation's wrongful detainer action. On appeal, the Circuit Court for Prince George's County affirmed the District Court's dismissal. The Corporation sought further review.

We conclude that the Corporation's wrongful detainer action may be resolved by applying neutral principles of Maryland law. It follows that the lower courts should not

have invoked the ecclesiastical abstention doctrine. Because it is undisputed that the Corporation holds legal title to the Property and has revoked Respondent's license to reside at the Property, the Corporation is entitled to judgment in its favor on its claim for wrongful detainer.

# I

# Background

## A. The Church

Under the Church's "Base of Law and Faith" (the "Bylaws"),[2] the Church is led by the Patriarch of the State of Eritrea. The Patriarch serves as the Chairman of the Synod, which – the parties do not dispute – is the highest ecclesiastical body within the Church. The Synod is comprised of the Patriarch, Archbishops, Bishops, and any additional members that the Synod selects to serve. The Bylaws describe the Synod as "the highest decision-making body of the Church[,]" as well as "the highest legislative body of the Church." The Synod also "Control the election of the patriarch, participate in the election, and the patriarch is elected, assigned by this body. Besides it participates in the decision making when the patriarch assigns the bishops."

After a bishop is elected – "in secret" by a committee assigned by the Synod – and the Synod approves the election, the Patriarch anoints and consecrates the bishop to lead and administer a diocese, which is the administrative body of the Church in a particular

---

[2] In quoting from the Bylaws, we do not correct what appear to be typographical and grammatical errors that presumably were made in the course of translating the Bylaws into English.

3

region of the world. The Bylaws authorize the Synod to remove the Patriarch or any bishop if they are "found to be involved in distorted teaching of the faith of the religion, Violating the law of the Church, [or] involving in abusive actions of his title[.]" Before any such disposition by the Synod, the accused Patriarch or bishop "has the right to defend for his right." The Synod's decisions are "final and has no appeal…. [I]f people return and accept their guiltness which they deny at the beginning, it is this body which is to show love and accept this repentance."

## B. Respondent's Appointment and Removal as Bishop

Respondent was appointed and ordained as the Church's Bishop of the United States and Canada in 2005 by the third Patriarch of Eritrea, Abune Antonios.[3] On or about January 17, 2006, as Bishop, Respondent filed the Corporation's Articles of Incorporation under Maryland law and became an initial member of the Corporation's Board of Directors (the "Board").

According to a biography of Abune Antonios published by the United States Commission on International Religious Freedom ("USCIRF"), available at https://perma.cc/A5G4-JW23, the Eritrean government notified Abune Antonios on January 20, 2006, that "he would be removed as patriarch and placed under house arrest." The biography states that "[t]he move by authorities came after Antonios had called for the release of political prisoners and resisted government pressure to excommunicate members of the church." According to USCIRF, on May 27, 2007, the Eritrean government

---

[3] "Abune" is an honorific title for a bishop or patriarch of the Church.

"replaced Antonios with Bishop Dioscoros of Mendefera, forcefully removed Antonios from his home, and detained him at an undisclosed location." USCIRF's biography of Abune Antonios states that he died in state custody in 2022 after 16 years of house arrest.

On June 10, 2016, the Synod issued a letter informing the Corporation of its decision to remove Respondent as Bishop of the United States and Canada for various alleged acts of disobedience, as of June 1, 2016. In this letter, the Synod stated that it had afforded Respondent multiple opportunities to be heard before his removal, including in a letter dated October 27, 2015, suspending Respondent "from authority and administrative responsibility of the diocese … until he comes back honoring the call of the Holy Synod" and in a prior letter dated July 29, 2015, demanding that Respondent "appear for a Holy Synod meeting" and "explain his case by showing up in person" before September 12, 2015. The June 10, 2016 letter further recited that the Synod had removed Respondent from membership in the Synod as of September 25, 2015, and had decided at that time that Respondent must "hand over property, money and documents under his custody[.]"

On or about June 16, 2016, the Board filed Articles of Amendment for a Religious Corporation (the "Articles of Amendment"), naming Priest Michael Teklay as Chairman of the Board.[4] Respondent was not listed in the Articles of Amendment as an officer of the Corporation and did not sign the Articles of Amendment as a trustee of the Corporation.

---

[4] The Articles of Amendment were signed by "Michael Teklemariam" in his capacity as a trustee of the Corporation. The record suggests that Michael Teklemariam may be the same person as Priest Michael Teklay, who is listed in the Articles of Amendment as the Chairman of the Board. As discussed below, Father Michael Teklemariam testified at the trial in this case.

5

Respondent asserts that he was neither given notice of the election of the new Board, nor given an opportunity to be present at the meeting removing him as Chairman of the Board, allegedly in violation of the Bylaws.

## C. The Dispute Concerning the Property

The Corporation purchased the Property in April 2011, and has held title to it in fee simple since that time. For the first several years after the purchase, Respondent resided at the Property with the permission of the Corporation, as the Board intended the Property to be used as a parsonage for the Bishop of the United States and Canada. It is undisputed that no lease has ever governed Respondent's possession of the Property.

Following the Synod's removal of Respondent as the Church's Bishop of the United States and Canada, the Corporation requested that Respondent vacate the Property. He did not do so.

In March 2021, Respondent filed Articles of Incorporation for a new, similarly named Maryland religious corporation: Eritrean Orthodox Tewahdo Church Diocese of the Union of Churches Abroad, Inc. (the "New Corporation"). The New Corporation's Articles of Incorporation stated that the address of its principal office in Maryland is 812 Chillum Road in Hyattsville – i.e., the Property – and named Respondent as the registered agent of the New Corporation with an address of 812 Chillum Road. The New Corporation's Articles of Incorporation listed 11 initial directors, including Respondent.

On March 9, 2022, the Corporation filed its first wrongful detainer action against Respondent in the District Court of Maryland sitting in Prince George's County, Case No. 05-01-SP03699-2022 (the "2022 Action"). At trial in the 2022 Action, Respondent's

6

counsel notified the court that Respondent had terminated his representation. The court granted counsel's motion to withdraw his appearance. Respondent did not appear for trial, and the court entered judgment by default in favor of the Corporation. Respondent timely appealed to the Circuit Court for Prince George's County. Represented by new counsel, Respondent appeared for trial in the circuit court. After receiving evidence, the circuit court granted Respondent's motion for a directed verdict on the ground that the Corporation failed to introduce the deed establishing its legal ownership of the Property. The Corporation did not seek further review in the 2022 Action.[5]

On or about July 12, 2024, counsel for the Corporation sent a letter to Respondent bearing the subject line: "FINAL Notice of Vacate Premises at 812 Chillum Road, Hyattsville, MD 20783." The letter was served on Respondent at the Property on July 15, 2024. The letter stated that the Synod is "the 'mother' church to the Diocese and the sole

---

[5] We take judicial notice that the Corporation filed the 2022 Action and of the disposition of that case in the District Court and the Circuit Court for Prince George's County. *See* Md. Rule 5-201(b), (c).

Respondent included the transcript of the trial in the circuit court in the 2022 Action as part of an Appendix to his brief in this Court. The Corporation filed a motion to strike that portion of Respondent's Appendix on the ground that Respondent did not make the circuit court transcript of the 2022 Action part of the record of the present case (the "2024 Action"). We have reviewed the transcript of the circuit court trial in the 2022 Action. The circuit court in that case made no findings of fact concerning the testimony upon which Respondent relies in this appeal. Rather, the circuit court found only that the Corporation had failed to prove its ownership of the Property. Other than the basis for the circuit court's entry of judgment in Respondent's favor, which is relevant only in discussing the history of the parties' dispute, we discern nothing relevant to the disposition of this appeal in the transcript of the circuit court trial in the 2022 Action that is not contained in the record of the 2024 Action. Accordingly, we grant the Corporation's motion to strike in part, and order that Pages 2 through 94 of the Appendix to Respondent's brief be stricken.

7

authority to appoint Bishops of the church." It recounted that the Synod appointed Respondent as Bishop in 2005, and that Respondent is aware that "the Property was purchased by the Diocese to serve as a residence for the appointed Bishop overseeing the Diocese when he is in the United States." The letter continued:

> On June 1, 2016, the Holy Synod, in its sole authority and discretion, removed your rank as Bishop due to your actions and statements against the Holy Synod and the church. Despite this revocation, you have remained in the home on the Property. On August 15, 2016, the Diocese provided you a written request that you were to vacate the Property as your title and appointment had been removed. Your continued occupancy of the Property has caused a strain on the Diocese in that they are not able to provide the residence for Abune Elyas Haylemikael Berihu, who was appointed Bishop of the Diocese by the Holy Synod on September 8, 2022.
>
> **Despite [the Corporation]'s request and lengthy litigation, you continue to occupy the Property without authorization from the [Corporation] or the Holy Synod. The [Corporation] now reiterates its disapproval of your continued presence at the Property….**
>
> **<u>This letter is your last notice to vacate the Property by or before 12:00 PM ET on July 28, 2024. If you fail to comply with this demand and have not vacated the Property by this date, we will proceed to file a wrongful detainer and eviction proceedings against you in court with all attorneys' fees, costs, and penalties assessed to you.</u>**

On August 14, 2024, the Board issued a resolution "properly moved, seconded and discussed, and by unanimous vote (0% abstention), passed and adopted" (the "Resolution") at a Board meeting on August 13. The Resolution stated, among other things:

> WHEREAS, the Corporation is the legal and equitable owner [of the Property]; and
>
> WHEREAS, the Corporation uses the Property as a parsonage for the Bishop appointed by the Holy Synod to oversee the Diocese; and

8

WHEREAS, [Respondent] was formerly the appointed Bishop … and was granted use the Property as a parsonage due to his role and employment with the Eritrean Orthodox Church; and

WHEREAS, in 2016 the Corporation received notice … from the Holy Synod that [Respondent] was no longer the Bishop overseeing the Diocese and accordingly, the Corporation requested [Respondent] to leave the Property so that it could be used for the new Bishop when appointed; and

WHEREAS, [Respondent] would not willingly leave and despite lengthy litigation he is still occupying the [Property] …; and

WHEREAS, [Respondent] has no right to reside at the Property nor does he have any written lease granting him present possession of the Property; and

WHEREAS, it remains necessary to make the parsonage on the Property available to our new Bishop appointed by the Holy Synod on September 8, 2022; it is hereby,

RESOLVED that the Board hereby ratifies the Holy Synod's decision regarding [Respondent]'s removal as Bishop; and it is further,

RESOLVED that the Board will take action through legal counsel to seek an eviction to remove [Respondent] from the Property.

**D. The 2024 Action**

On August 20, 2024, the Corporation filed a second wrongful detainer action in the District Court sitting in Prince George's County (the "2024 Action").

At trial, the Corporation called Father Michael Teklemariam as a witness. Father Teklemariam testified that he had been a member of the Board since 2015 and was then its Vice Chairman. He further testified that the Synod removed Respondent as the Church's Bishop of the United States and Canada in 2016, and that Respondent was no longer a member of the Corporation's Board. Father Teklemariam further testified that the

9

Corporation is the deed owner of the Property. The deed was admitted into evidence. According to Father Teklemariam, the Corporation pays property taxes on the Property.

Father Teklemariam further testified that, after the Synod removed Respondent as Bishop, the Synod instructed the Board "to remove [Respondent] from the property and accept a new bishop to live in that property as a bishop." Father Teklemariam testified that the Board asked Respondent to vacate the Property, but Respondent refused to do so. After the Corporation's attorney showed Father Teklemariam a copy of the Resolution, Father Teklemariam identified his signature on the Resolution and testified that he had signed the Resolution in his capacity as Vice Chairman of the Board.

Respondent testified that the decisions to remove him from the Board and to seek his eviction from the Property were illegitimate because Abune Antonios had suspended the bishops and priests, including Father Teklemariam, who had since been exercising authority within the Synod and the Board. On cross-examination, Respondent acknowledged that the Synod had suspended him as Bishop in 2015, but he disputed the Synod's authority to do so. Respondent testified that he "[doesn't] accept that [he is] not on the board" of the Corporation.

In delivering its ruling, the District Court summarized the evidence that the parties had presented:

> What we're really dealing with here today is a dispute about leadership of a religious organization. So on one hand, we have Bishop Sinoda, who has testified that he is the leader of the church that's before us today, the Eritrean Orthodox Tewahdo Church and that he is aware that they said they were going to remove him, that he received notice that they were going to remove him. But his testimony is that removal is ineffective, that

10

essentially they were out of their authority on it. And his law is based on church law, based on the organization from the church as he understands it.

On the other hand, we have Mr. Vice Chairman Teklemariam, who is also a religious leader of – considered very highly regarded within the organization. And he testifies essentially that his group was lawful, that they met as a board, that their board is the group which controls this religious organization, that his actions were with authority, and that essentially the owner of the property belongs to his group.

I do have the deed…. And it basically indicates that the [Corporation] is the owner of the property. It's the grantee. I do have an older document, which is the articles of incorporation of the [Corporation], in which Bishop Sinoda was the original incorporator back in 2006, it looks like.

So somewhere between 2006 … and today, there have been disputes within the church.

The District Court concluded that the resolution of those disputes would require it "to interpret religious law," and to decide which of the parties "is the appropriate group" to manage the affairs of the Corporation. The District Court concluded that, in making such a decision, it would be wading into a "theological thicket." Invoking the ecclesiastical abstention doctrine, the District Court abstained from deciding the merits of the Corporation's wrongful detainer claim and dismissed the Complaint.

The Corporation timely appealed to the Circuit Court for Prince George's County, which affirmed the judgment of the District Court. The circuit court noted that Respondent does not dispute that the Corporation "owns the Property where [Respondent] resides." However, in the circuit court's view, "[o]wnership is not the concern; the question is whether [Respondent] may remain on the premises or if the [Corporation] may reclaim the property." The circuit court concluded that, "[i]n determining [Respondent's] authorization to remain on the Property, or lack thereof, the Court would need to examine the basis of

11

[Respondent's] removal" as Bishop and would need to "determine who[] … is the appropriate leader and decision-maker." For this reason, the circuit court agreed with the District Court's decision to invoke the ecclesiastical abstention doctrine.

We granted the Corporation's petition for a writ of certiorari, *Eritrean Orthodox Tweahdo Diocese of USA & Canada v. Sinoda*, 492 Md. 697 (2025), to decide whether the lower courts properly invoked the ecclesiastical abstention doctrine.

## II

## Standard of Review

The questions we must decide in this case are ones of law. Therefore, our review is de novo. *See, e.g.*, *Balt. Police Dep't v. Open Justice Balt.*, 485 Md. 605, 644-45 (2023).

## III

## Discussion

The parties make similar arguments here as they did below. Respondent contends that the removal of Patriarch Antonios by the Eritrean government was invalid. As a result, Respondent argues, the existing "government-controlled" Synod was organized in violation of the Bylaws. Due to its illegitimacy, Respondent claims, the Synod lacked proper authority to defrock him as Bishop. Consequently, he was not properly removed from the Board, and the Board's subsequent decision to remove him from the Property – made without him present – was illegitimate. According to Respondent, he remains the true Bishop in control of the Corporation, with a possessory right to occupy the Property that serves as a parsonage for the current bishop. Respondent contends that, in order to decide whether or not he has a right to possess the Property, a Maryland court would need to

12

decide a question of religious doctrine. Accordingly, Respondent argues, the lower courts correctly invoked the ecclesiastical abstention doctrine.

The Corporation argues that Maryland courts have jurisdiction to determine whether Respondent is unlawfully in possession of the Property. First, the Corporation contends that the lower courts misunderstood the boundaries of the ecclesiastical abstention doctrine as defined by the United States Supreme Court. According to the Corporation, the ecclesiastical abstention doctrine obligates Maryland courts to defer to the highest church authority, in this case, the Synod. Thus, according to the Corporation, it would violate the ecclesiastical abstention doctrine if a Maryland court did not defer to the Synod's decision to remove Respondent as Bishop. Second, the Corporation argues that, separate and apart from whether the Synod's decision to remove Respondent as Bishop was valid under the Bylaws, this case may be decided under neutral principles of Maryland law. The Corporation asserts that it is undisputed that it owns the Property and that it has withdrawn permission for Respondent to reside there. Thus, according to the Corporation, as a matter of Maryland property law, it is entitled to reclaim possession of the Property from Respondent.

We agree with the Corporation that this case is properly decided under neutral principles of Maryland law and that it is entitled to judgment on its claim for wrongful detainer.[6]

---

[6] Because we agree with the Corporation's second argument, we shall not address its alternate contention – i.e., that the lower courts erred by not deferring to the Synod's decision to remove Respondent from his bishopric.

**A. The Ecclesiastical Abstention Doctrine Has No Application to This Case.**

Maryland courts have no authority to resolve religious disputes. *Mt. Olive Afr. Methodist Episcopal Church of Fruitland, Inc. v. Bd. of Incorporators of Afr. Methodist Episcopal Church Inc.*, 348 Md. 299, 309 (1997). To ensure that courts refrain from "becom[ing] embroiled" in such disputes, *id.* at 310, the ecclesiastical abstention doctrine prohibits courts from resolving legal claims that necessarily turn on "doctrinal propriety," *id.* at 311 (internal quotation marks and citation omitted). The judicial mandate to abstain from deciding religious disputes precludes Maryland courts from adjudicating lawsuits involving the interpretation of religious laws, including the determination of who holds legitimate ecclesiastical authority within a hierarchical church. *See Shaeffer v. Klee*, 100 Md. 264, 271 (1905).

"This does not mean, of course, that the courts may not resolve any issue in which a church or denomination is a party." *Mt. Olive*, 348 Md. at 310. While the ecclesiastical abstention doctrine protects religious bodies from judicial interference in internal management decisions and other spiritual matters, secular law applies where it does not infringe on religious prerogatives. If a court need not answer an ecclesiastical question to resolve a dispute, and can instead apply neutral principles of law to decide the merits, then the court must do so. In particular, when property rights are implicated, there exists a compelling interest for Maryland courts to "adjudicate those rights[,] not only to solve the particular case and the rights of the litigants before them, but also to preserve definiteness and order in the holding of property by religious corporations." *Md. & Va. Eldership of*

14

*Churches of God v. Church of God at Sharpsburg, Inc.*, 249 Md. 650, 661 (1968) (*Eldership I*), *vacated,* 393 U.S. 528 (1969).

To be sure, "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). However, "not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment." *Id.* The mere existence of an ecclesiastical disagreement between the parties is not "determinative of whether the civil courts can intervene to decide church property disputes." *Polen v. Cox*, 259 Md. 25, 30 (1970). When a dispute implicates solely questions of Maryland property law, e.g., the property dispute can be severed from the question of who the "true" or "legitimate" religious authority is within the hierarchical church, a court must resolve the dispute by applying neutral principles of law. *See Eldership I*, 249 Md. at 657-59 (holding that trustees of a local religious corporation own and control the property of a local church based on Maryland statutory law notwithstanding hierarchical church authority); *Mt. Olive*, 348 Md. at 320 (when a deed does not clearly indicate that local church holds property in trust for parent church, "all relevant documents and circumstances" must be considered in resolving property dispute); *From the Heart Church Ministries, Inc. v. Afr. Methodist Episcopal Zion Church,* 370 Md. 152, 179 (2002) (form of church government "is hardly dispositive"; court reviewed record to determine whether church property "was impressed with a trust, express or implied, in favor of" affiliated religious denomination) (quoting *Mt. Olive*, 348 Md. at 326 n.14).

Where there is no basis to conclude that a legal right to property is dependent upon church governance, the ecclesiastical abstention doctrine has no application. *See Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 254 Md. 162, 175-76 (1969) (*Eldership II*).[7] In *Eldership II*, consistent with the United States Supreme Court's intervening decision in *Hull Memorial Presbyterian Church*, we concluded that our analysis in *Eldership I*, in which we had applied neutral principles of law, was correct. The *Eldership* decisions involved a property dispute between the Maryland and Virginia Eldership of Churches of God (the "Eldership") and two local congregations that previously had been part of the Eldership but had since withdrawn from it. The question was whether, after withdrawing from the Eldership, the local churches retained control of their property. *See Eldership I*, 249 Md. at 656. In *Eldership II*, we catalogued the neutral principles of law upon which we had relied in *Eldership I*. First, we looked to "[s]tate statutory law in regard to the holding of property by religious corporations applicable to all religious corporations without regard to the doctrine or ecclesiastical practices of any particular religious sect or denomination." *Eldership II*, 254 Md. at 166 (emphasis omitted) (analyzing the Religious Corporations Law, then codified at Article 23, §§ 256-270, of the

---

[7] The United States Supreme Court vacated this Court's decision in *Eldership I* and remanded for reconsideration in light of *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterial Church*, 393 U.S. 440 (1969). We subsequently reaffirmed our holding in *Eldership I* in *Eldership II*. After initially granting certiorari to review this Court's decision in *Eldership II*, the Supreme Court dismissed the case "for want of a substantial federal question." *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970). The Supreme Court explained that, on remand, this Court resolved the dispute without making any "inquiry into religious doctrine[.]" *Id.* at 367-68. Thus, there was no potential First Amendment issue for the Supreme Court to decide. *See id.*

Maryland Code). Second, "we considered the express language of the deeds by which the properties in question were conveyed to local church corporations." *Id.* at 168. Third, we "considered the language of the charters of the two local church corporations involved." *Id.* at 169. Fourth, we considered the constitutions of the Eldership and of the national religious organization (the General Eldership of the Churches of God in North America (the "General Eldership")) to which the Eldership belonged. *Id.* at 171-72. Neither constitution contained a provision for loss or forfeiture of property by a local congregation if it were to withdraw from the Eldership. *Id.* at 172.[8]

Having found no indicia of the Eldership's legal right over the disputed property in the sources the Court consulted, we explained that the right to the local churches' property upon withdrawal from the Eldership did not devolve upon the Eldership "as an incident of the power of the Eldership to appoint clergymen for a local congregation." *Id.* at 175-76 (citation modified). Acknowledging that a hierarchical church is free to provide in its constitution for the disposition of property held by its local congregations, we concluded that "in the absence of such a provision[,] there is no 'contract' between the local church corporation and the parent body, which changes the provisions of the deeds and charters"

---

[8] We explained that our consideration of the constitutions of the Eldership and the General Eldership was "the application of a neutral principle of law, properly explored in resolving a dispute over local church property which in no way involves the Court in the determination of any theological or doctrinal matter." *Eldership II*, 254 Md. at 172 (citation modified). Put another way, it was appropriate for the Court to consult church governing documents to aid the Court in understanding whether church doctrine had any bearing on, let alone answered, the question before the Court.

giving the local congregation complete legal title, possession, and control over the property. *Id.* at 176.

Similarly, in *Mt. Olive*, we held that a civil court could decide a property dispute, notwithstanding that the underlying source of the dispute was an ecclesiastical controversy. 348 Md. at 311. There, a local church – Mount Olive African Methodist Episcopal Church of Fruitland, Inc. ("Mt. Olive") – withdrew from the church denomination, the African Methodist Episcopal Church (the "A.M.E."), and the A.M.E. subsequently claimed the right to Mt. Olive's property. *Id.* at 301-02, 305. Undisputed evidence showed that the A.M.E.'s constitution and other religious authoritative documents were silent on the issue, the deed to the properties indicated no reversionary interest to the A.M.E., and no Maryland law provided for the local church's property to revert to the parent denomination upon the local church's withdrawal. *See id.* at 326 n.14. The only evidence presented to the circuit court was "the form of church government," which this Court found "hardly dispositive" of the property dispute. *Id.* Notwithstanding the A.M.E.'s ecclesiastical authority over Mt. Olive, we affirmed the grant of summary judgment in favor of Mt. Olive based on neutral principles of law. *Id.* at 326.

Respondent argues that while "[c]ivil courts remain open to genuinely secular, neutral-principles claims," this case does not present such a claim because "the fundamental question of who holds ecclesiastical authority to act for the [Corporation] and to remove a bishop cannot be resolved without religious determinations." In response, the Corporation argues that, while this Court cannot decide whether the Synod properly defrocked Respondent, that question is immaterial. According to the Corporation, "[t]he

18

only question for the Court is whether the Corporation's Board has authorized [Respondent] to remain on its Property."

We agree with the Corporation. To resolve this case, it is not necessary to decide whether the Synod is legitimate or whether the decisions to defrock Respondent and to remove him from the Corporation's Board are doctrinally proper. The crux of Respondent's argument for his possessory interest in the Property is his position as Bishop. Because his status as Bishop grants him a right to occupy and use the Property for as long as he remains the rightful Bishop, Respondent argues that a court cannot adjudicate the wrongful detainer action without first deciding whether the Synod had valid ecclesiastical authority to remove him as Bishop.

However, the record lacks any evidence that there is any *legal* right for the Bishop of the United States and Canada to possess the Property. The Church's Bylaws are silent concerning the provision of a parsonage to any bishop. The deed to the Property mentions nothing about who will occupy the premises. It is undisputed that no lease provides for Respondent to occupy the Property for as long as he serves as Bishop (or for any other period of time). There is no evidence of any other contract – such as an employment agreement – under which the Church or the Corporation agrees to provide the Property for use as a parsonage to the Bishop of the United States and Canada. Lastly, the Maryland Religious Corporation Law is silent on any such property right conditioned on the employment of a clergyperson. *See* Md. Code Ann., Corps. & Ass'ns ("C&A") §§ 5-301 – 5-313 (1975, 2025 Repl. Vol.).

19

Respondent's argument essentially rests on the hierarchy of the Church: the Bishop leads the Diocese of the United States and Canada, and the Corporation provides the Property to the Bishop for use as a parsonage. But this Court has held that ecclesiastical hierarchy, without more, does not alter property rights provided under Maryland law. *See Mt. Olive*, 348 Md. at 320; *Eldership II*, 254 Md. at 175-76. In the absence of any express language concerning property rights within the religious documents of the Church, the resolution of this dispute does not turn on the "rightful" religious decision maker or the propriety of Respondent's removal as Bishop. The determination of those questions would not alter the civil property analysis because there is no evidence that the incumbent Bishop of the United States and Canada has a *legal* possessory interest in the Property.

In sum, the ecclesiastical abstention doctrine has no application to this case. We must resolve this property dispute through application of neutral principles of law. We now turn to that analysis.

### B. Under Neutral Principles of Law, the Corporation Is Entitled to Judgment on Its Claim for Wrongful Detainer.

1. Under Maryland's Religious Corporations Law, the Corporation Is Permitted to Designate Who Shall Occupy the Property.

In Maryland, trustees of religious corporations have the power to "[u]se, lease, mortgage, sell, or convey the assets [of the corporation] in the manner that the trustees consider most conducive to the interest of the … corporation." C&A § 5-306(a)(3); *see also Eldership I*, 249 Md. at 658 ("It is clear that when a congregation is incorporated under the General Religious Law applicable to all religious groups, the trustees and the local congregation own and control the property of the local church."). Maryland's Religious

Corporations Law "is concerned with the ownership, use and disposition of property, not with any religious theories, doctrines or tenets." *Eldership I*, 249 Md. at 658 (emphasis omitted).

It is undisputed that the Corporation holds legal title to the Property. Thus, the Board may use the Property "in the manner that the [Board] consider[s] most conducive to the interest" of the Corporation. C&A § 5-306(a)(3). That includes designating who, if anyone, shall have a license to reside at the Property.

The Corporation filed the Articles of Amendment on or about June 16, 2016, naming three principal officers of the Corporation, none of whom were Respondent. Subsequently, the Board issued the Resolution stating that it ratified the Synod's removal of Respondent as Bishop and authorized the Corporation, through counsel, to seek Respondent's eviction from the Property. The Corporation then filed the 2024 Action. The Corporation has made clear it wants Respondent to vacate the Property. Under the Religious Corporations Law, the Corporation, acting through the Board, has the power to seek Respondent's eviction.

Respondent seems to challenge the procedure by which the Corporation removed him as Chairman of the Board (and as a trustee): He argues that he was not given the opportunity to be present at the meeting where the new Board and officers were elected, and that "[t]he record does not contain any evidence that would normally be produced by a Maryland Corporation … to dispute this fact." To the extent Respondent contends that the election of the new Board and officers in June 2016 violated the Religious Corporations

21

Law, his remedy was to seek arbitration under C&A § 5-310.[9] Having apparently not done so, and instead having incorporated the New Corporation,[10] Respondent cannot be heard to complain in this case about the legitimacy of the Board as it was comprised after June

---

[9] Under C&A § 5-307(b), unless a religious corporation's plan provides otherwise, the trustees of the corporation "shall be elected and their successors continued at the time and place ordinarily used for public meetings of the church, by the individuals who, according to the custom and usage of the church, have a voice in the management and direction of congregational or temporal affairs."

Section 5-310 further provides:

(a) If any contest arises over the voting rights or the fair conduct of an election:

(1) Each contending party shall appoint one individual from among the members of a neighboring church of the same religious persuasion or, if there is no such church, from among the members of any other church; and

(2) The two appointed individuals shall select a third, similarly qualified, individual.

(b) The arbitrators shall meet at the place where the contest arose and hear and determine the matter.

(c) The judgment or award of a majority of the arbitrators, signed and acknowledged by them, is final.

[10] Under the Religious Corporations Law, members of a church may separate from the church, form a new house of worship, and employ a minister if: (1) "[t]hey are of sufficient number to form a house of worship and maintain a minister"; and (2) "[a]ll debts and contracts incurred by them as members of the original church are discharged." C&A § 5-311(a). "When incorporated, the new church is entitled to the benefits of this subtitle relating to religious corporations." *Id.* § 5-311(b). If the New Corporation purchases or rents a residential property, it of course may opt to use it as a parsonage for Respondent.

16, 2016. Nor can he complain that, under the Religious Corporations Law, the Board lacked authority to file the 2024 Action.[11]

With the legal ownership of the Property and the powers of the Board established, the only remaining question is whether Respondent has any independent, legally cognizable right to possess the Property under Maryland law.

2. <u>Respondent Has No Possessory Right Under Maryland Law to Occupy the Property.</u>

A wrongful detainer occurs when an individual "hold[s] possession of real property without the right of possession." Md. Code Ann., Real Prop. ("RP") § 14-132(a) (1999, 2023 Repl. Vol., 2025 Supp.). A claim of wrongful detainer is not available to a property owner if a remedy is available under Title 8 of the Real Property Article, which governs landlord-tenant relationships in Maryland. *See id.* § 14-132(b)(2). Because the actions available to a property owner seeking to recover possession of their property depend on whether the occupant is a tenant or a licensee, we must determine, as a threshold matter, whether a landlord-tenant relationship exists between Respondent and the Corporation. *See*

---

[11] Respondent contests the legitimacy of the Resolution signed by Father Teklemariam on August 14, 2024, because Father Teklemariam by then had served more than two three-year terms as a member of the Board, in alleged violation of applicable term limits. However, no documentary evidence in the record suggests that members of the Board are term-limited. Article 69 of the Bylaws refers to two three-year terms that may be served by members of the Church's "Regional Spiritual Congresses." However, the Bylaws make no connection between a Regional Spiritual Congress and the Board of Trustees of a religious corporation formed under the laws of a jurisdiction where a diocese of the Church is located. The Religious Corporations Law does not mandate term limits for trustees of a religious corporation's board. *See* C&A § 5-307(b).

23

*Uthus v. Valley Mill Camp, Inc.*, 472 Md. 378, 385-86 (2021). We answer that question in the negative.

Absent a written lease agreement, as is the case here, a valid landlord-tenant relationship may nevertheless be established through a non-written agreement. As we explained in *Uthus*:

> A landlord-tenant relationship likely exists when a person resides on the property of a landowner by virtue of an agreement that includes payments of rent and exclusive possession. The resident has the possessory right to exclude the landowner from entering the property without permission of the resident. The landowner, by virtue of the agreement, recognizes the resident's right to reside on the property, and the resident pays the landowner rent for residing on the property. Thus, when the indicia of a landlord-tenant relationship – exclusive possession, owner recognition, and rental payments – are present, a landlord-tenant relationship may be formed, regardless of whether the parties reduced their agreement to writing.

*Id.* at 388-89 (citations omitted). By contrast, permission by the property owner to occupy or use the property for a particular purpose creates a mere license when the totality of circumstances surrounding the use does not indicate the existence of a tenancy. *Id.* at 389.

In *Uthus*, we considered whether a former employee of the property owner was a licensee or a tenant, absent a written agreement between the parties. *Id.* at 387. Uthus worked for Valley Mill, a family-owned seasonal camp. *Id.* at 383. Beginning in 1997, Uthus began working at the camp year-round, eventually serving as camp director and as a member of Valley Mill's board of directors. *Id.* For the next two decades, as part of his employment, Valley Mill provided Uthus with a car, an apartment unit on the campgrounds rent-free, and health insurance. *Id.* After a series of escalating disagreements, Valley Mill

24

terminated Uthus's employment, removed him from the board of directors, and requested that he vacate the campgrounds. *Id.* at 383-84. He refused. *Id.*

Without a written lease agreement governing Uthus's occupancy, we looked for the "helpful hallmarks of a tenancy" – payment of rent, owner recognition of a tenancy, and exclusive possession – in determining the nature of Uthus's right to use and occupy the apartment on the campgrounds. *Id.* at 392. Uthus had never paid rent to Valley Mill for the right to live in the apartment, nor had Valley Mill granted Uthus exclusive possession of the apartment; rather, Uthus was "an employee who was allowed to reside in the apartment on the campgrounds during the tenure of his employment." *See id.* Based on these circumstances, we held that Uthus was not a tenant of Valley Mill, but rather a licensee. *Id.* In so concluding, we explained that neither Uthus's actual possession of the apartment, nor the longevity of his residency, was sufficient to overcome the lack of hallmarks of a tenancy. *Id.*

Here, similar to Valley Mill's permission to Uthus to live in the apartment on the campgrounds while he was employed there, the Corporation permitted Respondent to use the Property as a parsonage "due to his role and employment with the Eritrean Orthodox Church[.]" It is undisputed that there was never a written lease that governed Respondent's occupancy of the Property. Thus, we examine the "hallmarks of a tenancy," *Uthus*, 472 Md. at 392, to determine whether Respondent was the Corporation's tenant or licensee with respect to the Property.

Respondent does not dispute that he made no rent payments to the Corporation for the right to reside at the Property. Indeed, in his brief, Respondent states "the Bishop does

25

not retain possession by paying rent, but by being the Bishop." In addition, there is no evidence that the Corporation ever recognized Respondent as a tenant with an exclusive right to possess the Property. The record reflects that the Corporation permitted Respondent to occupy the Property due to his position within the Church, and that he has remained in actual possession of the Property since 2011, against the will of the Corporation since 2016. As a matter of law, Respondent is a mere licensee with respect to the Property, notwithstanding his actual possession of the Property and the longevity of his occupancy. *See Uthus*, 472 Md. at 392.

While a tenant has certain legal rights to possession recognized by Maryland law, a licensee only enjoys limited privileges with the consent of a landowner. *Id.* at 389. A license is "[a] mere permission to use land, [with] dominion over it remaining in the owner and *no interest in* or exclusive possession of it being given" to the licensee. *Delauter v. Shafer*, 374 Md. 317, 325 (2003) (emphasis added). Unlike a tenancy, a license to occupy property may be revoked "at the pleasure of the licensor[.]" *Uthus*, 472 Md. at 389 (quoting *Balt. & Ohio. R.R. Co. v. Potomac Coal Co.*, 51 Md. 327, 330 (1879) (alteration by the Court)). Upon revocation of a license by the licensor, the licensee has no possessory right that can be asserted against the licensor. *Delauter*, 374 Md. at 325 ("Such a person has not the possession of the land, this remaining in the licensor, and he has not, it seems, any interest in the land which he can assert as against a third person, that is, he has no rights in rem.") (citation omitted).

In Maryland, a license may be effectively revoked by a request to vacate the premises. *See Uthus*, 472 Md. at 392. It is undisputed that the Corporation has asked

26

Respondent to vacate the Property on multiple occasions, and that Respondent was aware of such requests prior to the filing of the 2024 Action. In short, it is undisputed that the Corporation has revoked Respondent's license to occupy the Property. As a matter of law, the Corporation is entitled to judgment on its claim for wrongful detainer. Accordingly, we shall direct a remand to the District Court to enter judgment in favor of the Corporation. On remand, the District Court shall resolve any outstanding issues, including the Corporation's claims for damages and attorney's fees. *See* RP § 14-132(f)(2).

## IV

## Conclusion

The lower courts erred in invoking the ecclesiastical abstention doctrine. That doctrine has no application to this case because Respondent's right to possess the Property does not turn on whether he is the Church's rightful Bishop of the United States and Canada. Applying neutral principles of Maryland property law to the undisputed facts of this case, we conclude that Respondent was a licensee with respect to the Property and that the Corporation has revoked Respondent's license to reside at the Property. Because Respondent, as a matter of law, does not have a legal right to possess the Property, the Corporation is entitled to judgment on its claim for wrongful detainer.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH THE INSTRUCTION TO FURTHER REMAND THE CASE TO THE DISTRICT COURT OF MARYLAND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.**